**No. 24-4751**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

ECHOSPAN, INC.
*Plaintiff–Appellant,*
v.
MEDALLIA, INC.
*Defendant–Appellee.*

---

On appeal from United States District Court, Northern District of California,
No. 5:22-cv-01732-NC, Hon. Nathaniel M. Cousins

---

# APPELLANT'S OPENING BRIEF

# [REDACTED]

---

**COUNCILL, GUNNEMANN &
CHALLY LLC**
Jonathan R. Chally
*jchally@cgc-law.com*
Jennifer R. Virostko
*jvirostko@cgc-law.com*
75 14th Street NE, Suite 2475
Atlanta, Georgia 30309
(404) 407-5250

**LEWIS & LLEWELLYN LLP**
*Evangeline A.Z. Burbidge
*eburbidge@lewisllewellyn.com*
Zachary C. Flood
*zflood@lewisllewellyn.com*
601 Montgomery Street, Suite 2000
San Francisco, California 94111
(415) 800-0590

**GREINES, MARTIN, STEIN & RICHLAND LLP**
*Jeffrey Gurrola
*jgurrola@gmsr.com*
Alex Chemerinsky
*achemerinsky@gmsr.com*
6420 Wilshire Boulevard, Suite 1100
Los Angeles, California 90048
(310) 859-7811

*Attorneys for Plaintiff–Appellant* ECHOSPAN, INC.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure,

Plaintiff/Appellant ECHOSPAN, INC. states:  Appellant has no parent company,

and no publicly held corporation owns 10% or more of its stock.

Dated: February 3, 2025

**GREINES, MARTIN, STEIN & RICHLAND LLP**
Jeffrey Gurrola
Alex Chemerinsky

**COUNCILL, GUNNEMANN & CHALLY LLC**
Jonathan R. Chally
Jennifer R. Virostko

**LEWIS & LLEWELLYN LLP**
Evangeline A.Z. Burbidge
Zachary C. Flood

By:    *s/ Jeffrey Gurrola*

Jeffrey Gurrola

Attorneys for Plaintiff/Appellant ECHOSPAN, INC.

2

**TABLE OF CONTENTS**

PAGE

CORPORATE DISCLOSURE STATEMENT    2

INTRODUCTION    3

JURISDICTIONAL STATEMENT    5

STATEMENT OF ISSUES    6

STATEMENT OF THE CASE    7

   A.    Plaintiff EchoSpan sells 360°-review employee feedback software to customers including Bank of America.    7

   B.    Bank of America hires defendant Medallia to replace EchoSpan as the bank's provider of 360°-review software.    8

     1.    Seeking to consolidate platforms, Bank of America selects Medallia's proposal to create a new 360°-review system.    8

     2.    Medallia quickly discovers that it cannot build the 360°-review software the bank wants on the bank's timeline.    8

   C.    Unable to deliver on its promise to Bank of America, Medallia steals EchoSpan's secrets to create a competing product.    9

     1.    Medallia applies for trial access to EchoSpan's system under the false pretense that Medallia is a potential EchoSpan customer and signs a confidentiality agreement.    9

     2.    Medallia initiates discussions about a potential merger with EchoSpan, again obtaining access to confidential information about EchoSpan's system.    11

   D.    After a whistleblower discloses Medallia's theft, EchoSpan sues.    11

i

## TABLE OF CONTENTS

PAGE

E.   The case proceeds to trial.    13

     1.   Before trial, the district court twice rules that apportionment of damages is a question for the jury.    13

     2.   During trial, the court denies Medallia's motion for judgment as a matter of law on damages, again ruling that apportionment is a jury question.    14

         a.   After the close of EchoSpan's case-in-chief, the court grants judgment to Medallia as to two of nine alleged trade secrets.    14

         b.   The court rejects Medallia's argument that a defense judgment is required because EchoSpan's expert did not apportion damages by trade secret.    14

     3.   In its rebuttal case, EchoSpan puts on additional evidence of damages.    16

     4.   The jury finds that Medallia misappropriated EchoSpan's administrative tool and awards $11.7 million in compensatory damages—half of the total EchoSpan had requested—as well as $14 million in exemplary damages.    17

F.   After trial, the district court grants Medallia's renewed motion for judgment as a matter of law on damages.    18

     1.   The court rules that because EchoSpan's experts did not explicitly apportion damages among the nine alleged trade secrets, the jury lacked an adequate basis on which to award damages as a matter of law.    18

     2.   The court enters an amended judgment, which EchoSpan appeals.    19

ii

**TABLE OF CONTENTS**

**PAGE**

G.    After the amended judgment wipes out its entire $25.7 million damages award, EchoSpan moves for a new trial or, alternatively, for injunctive relief.  The district court denies all relief.    20

SUMMARY OF THE ARGUMENT    21

STANDARD OF REVIEW    22

ARGUMENT    23

I.    The Judgment As A Matter Of Law Must Be Reversed Because The Jury's Damages Award Had An Adequate Basis In The Trial Evidence.    23

    A.    Damages need only be proven with reasonable certainty and, once awarded by a jury, are entitled to great deference.    23

    B.    The district court erred in concluding that the jury's award was speculative.    25

        1.    The jury apportioned its damages award, and that apportioned award is supported by the trial evidence.    25

            a.    The district court failed to view the award in the light most favorable to EchoSpan.    25

            b.    Drawing more adverse inferences, the district court disregarded ample evidence of each trade secret's respective function and relative importance from which the jury could apportion damages.    29

iii

# TABLE OF CONTENTS

**PAGE**

2.     The district court imposed incorrect evidentiary requirements.   34

    a.    Trade secret damages are subject to a flexible standard that does not require an expert to explicitly assign dollar amounts to each alleged trade secret.   34

    b.    Rather than adhering to the flexible damages standard, the district court followed an older case that applied a stricter standard under materially different circumstances.   39

II.    The Judgment As A Matter Of Law Must Be Reversed For The Independent Reason That The Jury Was Not Required To Apportion Damages And Its Award Was Well Within The Range Of Evidence.   45

    A.    The district court improperly required EchoSpan to prove apportionment was impossible.   45

    B.    Because the jury's award was within the range of damages shown, judgment as a matter of law was improper.   49

III.    At A Minimum, A New Trial On Damages Is Required To Prevent A Miscarriage Of Justice.   50

    A.    A new trial can be granted "on any ground necessary to prevent a miscarriage of justice."   50

    B.    The district court changed the playing field for trial at the "eleventh and a half hour." EchoSpan had no ability to anticipate or adjust to the new rules of the game.   51

iv

# TABLE OF CONTENTS

**PAGE**

C. The post-verdict retroactive requirement of expert apportionment testimony caused a miscarriage of justice; denying EchoSpan a new trial on damages was an abuse of discretion.   53

    1. The district court abused its discretion by denying the new trial motion based on its conclusion that the underlying judgment as a matter of law against EchoSpan was correct.   53

    2. Any implicit finding that the post-verdict change of course on a novel issue of law did not create a miscarriage of justice was likewise an abuse of discretion.   56

CONCLUSION   59

CERTIFICATE OF COMPLIANCE FOR BRIEFS   60

STATEMENT OF RELATED CASES   61

CERTIFICATE OF SERVICE   62

v

# TABLE OF AUTHORITIES

**PAGE(S)**

## Cases

*Air Et Chaleur, S.A. v. Janeway*
757 F.2d 489 (2d Cir.1985) ................................ 50

*Apple Inc. v. Wi-LAN*
25 F.4th 960 (Fed Cir. 2022) ................................ 58

*ATS Products Inc. v. Ghiorso*
2012 WL 253315 (N.D. Cal. Jan. 26, 2012) ......... 37, 38, 41, 51, 53

*Beasley v. Wachovia Bank*
627 S.E.2d 417 (Ga. Ct. App. 2006) ................. 24, 49

*Birch Prop. Partners, LLC v. Simpson*
874 S.E.2d 814 (Ga. Ct. App. 2022) ................. 24

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*
331 F. Supp. 3d 977 (N.D. Cal. 2018) ............... 38, 40, 41, 42

*BladeRoom Grp., Ltd. v. Facebook, Inc.*
2018 WL 1611835 (N.D. Cal. Apr. 3, 2018) ........ 38, 40, 41, 51, 53

*Camreta v. Greene*
563 U.S. 692 (2011) ................................ 41

*Canton Plaza, Inc. v. Regions Bank, Inc.*
732 S.E.2d 449 (Ga. Ct. App. 2012) ................. 23

*Cartel Asset Mgmt. v. Ocwen Fin. Corp.*
249 F.App'x 63 (10th Cir. 2007) ................. 46

*Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*
53 F.4th 368 (6th Cir. 2022) ................. 35, 36, 41, 48

*City of Phoenix v. Com/Systems, Inc.*
706 F.2d 1033 (9th Cir. 1983) ................. 24, 50

vi

# TABLE OF AUTHORITIES

**PAGE(S)**

*ClearOne Commc'ns, Inc. v Biamp Sys.*
  653 F.3d 1163 (10th Cir. 2011) — 28

*Coughlin v. Tailhook Ass'n*
  112 F.3d 1052 (9th Cir. 1997) — 55

*Dream Games of Arizona, Inc. v. PC Onsite*
  561 F.3d 983 (9th Cir. 2009) — 6

*DSC Commc'ns Corp. v. Next Level Commc'ns*
  107 F.3d 322 (5th Cir. 2017) — 35

*Electro-Miniatures Corp. v. Wendon Co.*
  771 F.2d 23 (2d Cir. 1985) — 23

*Equate Media, Inc. v. Suthar*
  2023 WL 7297328 (9th Cir. Nov. 6, 2023) — 38

*Escriba v. Foster Poultry Farms, Inc.*
  743 F.3d 1236 (9th Cir. 2014) — 22, 28

*Essex Grp., Inc. v. Southwire Co.*
  501 S.E.2d 501 (Ga. 1998) — 45

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*
  762 F.3d 829 (9th Cir. 2014) — 50

*Gray v. Hudson*
  28 F.4th 87 (9th Cir. 2022) — 22

*Hart v. Massanari*
  266 F.3d 1155 (9th Cir. 2001) — 52

*Holland Livestock Ranch v. United States*
  655 F.2d 1002 (9th Cir. 1981) — 23, 24

*Howard v. Everex Sys., Inc.*
  228 F.3d 1057 (9th Cir. 2000) — 7

vii

# TABLE OF AUTHORITIES

**PAGE(S)**

*In re Cervantes*
219 F.3d 955 (9th Cir. 2000) .......... 56

*In re First All. Mortg. Co.*
471 F.3d 977 (9th Cir. 2006) .......... 22, 23

*In re Urethane Antitrust Litig.*
768 F.3d 1245 (10th Cir. 2014) .......... 24

*Jenson v. Eveleth Taconite Co.*
130 F.3d 1287 (8th Cir. 1997) .......... 46

*Johnson v. Paradise Valley Unified Sch. Dist.*
251 F.3d 1222 (9th Cir. 2001) .......... 48, 56

*Kroger Co. v. U.S. Foodservice of Atlanta, Inc.*
607 S.E.2d 177 (Ga. Ct. App. 2004) .......... 23, 24

*LaserDynamics, Inc. v. Quanta* Computer
694 F.3d 51 (Fed. Cir. 2012) .......... 58

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*
791 F.2d 1356 (9th Cir. 1986) .......... 49

*McMillian v. McMillian*
713 S.E.2d 920 (Ga. Ct. App. 2011) .......... 39

*Moist Cold Refrigerator Co. v. Lou Johnson Co.*
249 F.2d 246 (9th Cir. 1957) .......... 23

*Molski v. M.J. Cable, Inc.*
481 F.3d 724 (9th Cir. 2007) .......... 22

*Motorola Sols., Inc. v. Hytera Commc'ns. Corp. Ltd.*
108 F.4th 458 (7th Cir. 2024) .......... 45, 47

*Murphy v. City of Long Beach*
914 F.2d 183 (9th Cir. 1990) .......... 50, 55

viii

# TABLE OF AUTHORITIES

**PAGE(S)**

*Nintendo of America, Inc. v. Dragon Pacific Int'l*
  40 F.3d 1007 (9th Cir. 1994) ............................................. 47

*O2 Micro International Ltd. v. Monolithic Power Systems, Inc.*
  399 F.Supp.2d 1064 (N.D. Cal. 2005) ............. 39-43, 48, 53, 57

*Omega Patents, LLC v. CalAmp Corp.*
  13 F.4th 1361 (Fed. Cir. 2021) ....................................... 47, 58

*Owens v. Novae, LLC*
  357 Ga.App. 240 (2020) ................................................... 39

*Pendley v. Pendley*
  302 S.E.2d 554 (Ga. 1983) ................................................ 23

*Perez-Perez v. Popular Leasing Rental, Inc.*
  993 F.2d 281 (1st Cir. 1993) ............................................. 54

*Raynor Bros. v. Am. Cyanimid Co.*
  695 F.2d 382 (9th Cir. 1982) ............................................ 49

*Reeves v. Sanderson Plumbing Prods., Inc.*
  530 U.S. 133 (2000) ......................................................... 27

*Richardson v. Marsh*
  481 U.S. 200 (1987) ......................................................... 44

*Russo v. Ballard Medical Products*
  550 F.3d 1004 (10th Cir. 2008) ............................... 33, 36, 37

*Sanford v. Crittendon Mem. Hosp.* 1
  41 F.3d 882 (8th Cir. 1998) ............................................... 54

*Skye Orthobiologics, LLC v. CTM Biomedical, LLC*
  2023 WL 5667558 (C.D. Cal. Aug. 9, 2023) ..................... 40

*SPS Techs., LLC v. Briles Aerospace, Inc.*
  2021 WL 4913509 (C.D. Cal. Sept. 8, 2021) ................... 40

ix

# TABLE OF AUTHORITIES

**PAGE(S)**

*Stevens v. Bangor & Aroostook RR. Co.*
  97 F.3d 594 (1st Cir. 1996) ............................................. 45

*Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*
  68 F.4th 792 (2d Cir. 2023) ............................................. 34

*Tri-Tron Int'l v. Velto*
  525 F.2d 432 (9th Cir. 1975) ........................................... 37

*Trotman v. Velociteach Project Management, LLC*
  715 S.E.2d 449 (Ga. Ct. App. 2011) ........................... 32, 33, 49

*Twigg v. Norton Co.*
  894 F.2d 672 (4th Cir. 1990) ....................................... 50, 54

*VLSI Tech. LLC v. Intel Corp.*
  87 F.4th 1332 (Fed. Cir. 2023) ........................................ 58

*Watec Co., Ltd. v. Liu*
  403 F.3d 645 (9th Cir. 2005) ........................................... 22

*Wellogix, Inc. v. Accenture, L.L.P.*
  716 F.3d 867 (5th Cir. 2013) ....................................... 34, 35

*White v. Arthur Enterprises, Inc.*
  464 S.E.2d 225 (Ga. Ct. App. 1995) ........................... 33, 35, 49

*Williams v. Gaye*
  895 F.3d 1106 (9th Cir. 2018) ..................................... 22, 56

*Wright v. Apartment Inv. & Mgmt. Co.*
  726 S.E.2d 779 (Ga. Ct. App. 2012) ................................... 39

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*
  259 F.3d 1101 (9th Cir. 2001) ..................................... 24, 38

x

# TABLE OF AUTHORITIES

**PAGE(S)**

**Statutes**

| | |
|---|---|
| 18 U.S.C. § 1836 | 12 |
| 28 U.S.C. § 1291 | 5 |
| Cal. Civ. Code § 3426.3 | 40, 41 |
| Ga. Code Ann. § 10-1-762 | 12 |
| Ga. Code Ann. § 10-1-763 | 12, 41 |
| Ga. Code Ann. § 10-1-764 | 12 |
| Ga. Code Ann. § 51-12 | 23 |

**Rules**

| | |
|---|---|
| Fed. R. App. P. 4(a)(1)(A) | 5 |

**Other Authorities**

| | |
|---|---|
| Restatement (Second) of Torts § 433B | 46 |
| Restatement (Third) of Unfair Competition § 45 | 35, 45, 46 |

xi

## INTRODUCTION

A jury found that Medallia, Inc. misappropriated the key feature of EchoSpan Inc.'s proprietary software:  the "administrative tool."  To accomplish this theft, Medallia posed as a potential customer to obtain restricted access to EchoSpan's software.  It then used that ill-gotten access to copy the software and poach EchoSpan's largest client.

EchoSpan alleged misappropriation of nine trade secrets, seeking unjust enrichment damages totaling $23.4 million.  Before trial, Medallia unsuccessfully moved for summary judgment (or alternatively, to bifurcate trial) on the basis that EchoSpan's expert did not assign a specific dollar value to each alleged trade secret.  Mid-trial, Medallia moved unsuccessfully for judgment as a matter of law (JMOL), again based on the lack of expert testimony apportioning damages.  Each time, the district court said the issue was for the jury.

The jury found that Medallia misappropriated EchoSpan's most important trade secret and awarded $11.7 million—half the total unjust enrichment damages EchoSpan requested.  It also awarded $14 million in exemplary damages based on Medallia's willful and malicious misconduct.

Medallia renewed its JMOL motion—again on the basis that no expert apportioned damages among trade secrets.  This time, the court granted the motion. This time, the court ruled that expert apportionment testimony had been required all along.  It reduced the jury's verdict to zero.

To reach this conclusion, the court repeatedly erred.

3

First, it construed the evidence in the light most favorable to Medallia, rather than EchoSpan. It concluded that the jury did not apportion its award but rather awarded the full amount of damages EchoSpan requested. Not so. EchoSpan requested approximately $23.4 million in unjust enrichment damages; the jury awarded half that amount: $11.7 million.

Second, the court invented a "mathematical precision" requirement for damages never before recognized by this Circuit and with no basis in law. To do so, it relied on a single inapposite case arising in the patent context. That case did not cite a single apportionment-related authority, conjuring its expert-testimony requirement out of thin air. The court here ignored more recent cases from its own district concluding that such testimony is unnecessary and that juries are capable of apportioning trade secret damages.

Third, the court ignored the ordinary rules of tort law, which govern apportionment in trade secret cases. Those rules dictate that the defendant wrongdoer—not the injured plaintiff—is responsible for providing a basis to apportion.

The district court's errors compel reversal of the JMOL and reinstatement of the jury verdict.

And even if they didn't, they justify a new trial on damages. The district court itself suggested the idea, and Medallia agreed. Yet when EchoSpan sought a new trial just weeks later, the district court denied the motion. In eleven lines of

text, the court found there was no unfair surprise because its underlying JMOL was legally correct.

That was error: Federal law expressly provides for a new trial motion following judgment a matter of law. The standard on such a new trial motion is not, and cannot be, whether the underlying JMOL was correct. Such a standard would render the entire procedure futile. Any implicit finding by the court that there was no miscarriage of justice in its post-verdict determination that expert apportionment testimony had been required all along—and its associated elimination of the full $25.7 million damages award—was an abuse of discretion. The post-verdict change to the rules of trial was a manifest miscarriage of justice.

This court should reverse the JMOL and reinstate the jury's verdict. At a minimum, it should order a new trial on damages.

## JURISDICTIONAL STATEMENT

This appeal arises from a final judgment of the Northern District of California disposing of all claims with respect to all parties. 28 U.S.C. § 1291. The district court granted JMOL and entered an amended judgment on July 2, 2024. 4-ER-627–28. EchoSpan timely appealed that amended judgment on July 31, 2024. *See* 4-ER-599; Fed. R. App. P. 4(a)(1)(A).

On September 19, 2024, the district court denied EchoSpan's new trial motion. 1-ER-8. EchoSpan timely filed an amended notice of appeal on October 15. 3-ER-595. The post-JMOL new trial order is reviewable on appeal from the

JMOL ruling. *See Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983, 994 (9th Cir. 2009).

## STATEMENT OF ISSUES

1. Both federal and Georgia courts take a "flexible and imaginative approach" to calculating trade secret damages. Does the Ninth Circuit apply this flexible standard, or does it adopt the district court's (a) improper inference that—despite awarding only 50 percent of the requested unjust enrichment damages—the jury did not reduce its award to account for trade secrets on which EchoSpan did not prevail and (b) related conclusion that a jury's damages award lacks a reasonable basis unless the plaintiff provides expert testimony assigning specific dollar values to each trade secret?

2. Does the Ninth Circuit join other jurisdictions' view that in trade secret cases, ordinary tort damages rules place no burden on the plaintiff to provide a basis for the jury to apportion damages?

3. Does a district court apply the wrong standard—and thus err as a matter of law—by denying the new trial motion on the basis that the underlying JMOL was legally proper?

6

## STATEMENT OF THE CASE

"In reviewing a JMOL, [courts] must view the evidence in the light most favorable to the non-moving party and draw every reasonable inference therefrom in the non-moving party's favor." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1060 (9th Cir. 2000). We state the facts underlying the jury's verdict accordingly.

### A. Plaintiff EchoSpan sells 360°-review employee feedback software to customers including Bank of America.

EchoSpan produces and sells employee-feedback software. 6-ER-952–53; 7-ER-1173–74. EchoSpan's software provides "360-degree review" capabilities: It allows employers to collect employee reviews from many sources—"managers, peers, direct reports"—and organizes that data into usable reports. 6-ER-952–53. In addition to 360°-review, EchoSpan's software provides performance management capabilities, a kind of employee feedback distinct from 360°-review. 7-ER-1173–74. EchoSpan's "competitive edge" is its software's "configurability and automation capabilities." 7-ER-1178–79; *see also* 6-ER-955.

EchoSpan's system was secret. 7-ER-1178–91. To facilitate sales, however, EchoSpan offered prospective clients trial access to its system. 6-ER-962–63. This temporarily gave prospective clients complete access to EchoSpan's system and allowed them to peruse and test it out. 6-ER-977–78. To gain trial access, prospective clients must agree to EchoSpan's terms and conditions, which mandate confidentiality and prohibit users from reverse-engineering EchoSpan's system or creating a competing product. 6-ER-970–74.

7

Until the events giving rise to this case, EchoSpan's largest customer was Bank of America. 6-ER-978. The bank was an EchoSpan customer for more than a decade. 7-ER-1249–50.

### B. Bank of America hires defendant Medallia to replace EchoSpan as the bank's provider of 360°-review software.

#### 1. Seeking to consolidate platforms, Bank of America selects Medallia's proposal to create a new 360°-review system.

In 2019, Bank of America solicited proposals for new 360°-review software. 1-ER-12; 8-ER-1524–25. EchoSpan took a "personal approach" to the request for proposal, reaching out directly to its longtime customer about the request. 6-ER-980. Things proceeded normally for a while: Despite the 2019 request for proposal, the bank again renewed EchoSpan's contract in January 2020. 6-ER-981–82.

Although EchoSpan did not yet know it, however, Bank of America had awarded a 360°-review contract to Medallia. 6-ER-983.

#### 2. Medallia quickly discovers that it cannot build the 360°-review software the bank wants on the bank's timeline.

Medallia wasn't ready to develop the software that Bank of America wanted. After winning the contract, Medallia learned that the bank expected a single system providing both a 360°-review component and a separate performance-management component. 7-ER-1074–75. From Medallia's perspective, the performance-management component was a "completely new project." *Id.*

In essence, Bank of America needed Medallia to "replicat[e]" the processes the bank had in place with EchoSpan. 7-ER-1093–94. Faced with that task,

8

Medallia employees complained that they were "stuck rebuilding EchoSpan" for Bank of America. 7-ER-1095–96.

Medallia wasn't equipped to build that software on the bank's timeline. 7-ER-1071–72 (describing the project as "a complex task in the time frame and the resources [Medallia] had, and considering the other projects we had"). In fact, Medallia was "a million miles away" from satisfying the bank's request. 7-ER-1072–73; 5-ER-696. Internal messages show Medallia employees worried about meeting the project's requirements. 7-ER-1075–76; 5-ER-727 ("its just too aggressive a time line").

### C. Unable to deliver on its promise to Bank of America, Medallia steals EchoSpan's secrets to create a competing product.

#### 1. Medallia applies for trial access to EchoSpan's system under the false pretense that Medallia is a potential EchoSpan customer and signs a confidentiality agreement.

Unable to build the software on its own, Medallia stole it instead. 2-ER-323. Medallia changed focus to performing a "lift and shift" of EchoSpan's system functionality—with which the bank was already accustomed—into the platform Medallia was building. 7-ER-1085–88; 5-ER-731–32.

Acting at the direction of her boss, and with explicit approval, Medallia product manager Pallavi Kapnadak applied for trial access to EchoSpan's system. 7-ER-1063–67; 1-ER-13. Multiple Medallia executives knew of the plan and conferred before giving Kapnadak approval. *Id.* Kapnadak falsely stated in her application that she had 500 potential users, which would have been a lucrative contract for EchoSpan. 6-ER-966–67.

9

EchoSpan investigated Medallia's application and approved trial access because it concluded that Medallia was a legitimate prospective customer and not a competitor. 6-ER-1005–06. Kapnadak signed EchoSpan's terms and conditions, which prohibited accessing the system to create a competing product. 6-ER-970, 973–74. Kapnadak set up Medallia's trial account and shared the log-in credentials with other Medallia personnel. 1-ER-13. The trial gave Medallia complete access to EchoSpan's product. 6-ER-977–78.

Medallia developed experience with EchoSpan's proprietary system, copied detailed settings information, took screenshots, and compiled detailed notes. 1-ER-13; 5-ER-690–91; *id.* at 693–95 (Medallia employee: "I got a bunch of admin screenshots from Echospan"); *id.* at 724–25 (employee describing "seeing how the whole [EchoSpan] process works," including how it "added raters"; another employee doing the same because he "wanted to get the report config to poke a round [*sic*]"); *id.* at 730 (Medallia employee: "I went into echospan last night and took a bunch of screenshots that might be helpful").

Medallia executives were uncomfortable with the duplicity: Kapnadak's conversations with one Medallia executive set off "red flags" because the executive "didn't want to be involved." 1-ER-13. When Kapnadak later left Medallia, the only thing she retained was a screenshot of her supervisors preapproving her trial access to EchoSpan's system. *Id*.

10

**2.** **Medallia initiates discussions about a potential merger with EchoSpan, again obtaining access to confidential information about EchoSpan's system.**

After the trial access ended, EchoSpan reached out to its contact at Medallia, Rory Cameron. 7-ER-1221–22. Cameron put EchoSpan in touch with Medallia's mergers-and-acquisitions people. *Id.*

Medallia was still struggling to keep pace on the Bank of America project. 7-ER-1135–38. Six months after acknowledging that Medallia was "a million miles away" from finishing the project, Medallia's vice president floated the possibility of satisfying the bank's needs via "acquisition rather than building organically," with EchoSpan as the only potential acquisition. 7-ER-1075–78.

Medallia pursued an acquisition of EchoSpan, signing a non-disclosure agreement and again gaining access to confidential information about EchoSpan's system. 7-ER-1223; 8-ER-1343. Medallia never disclosed that it had been awarded the Bank of America contract or that it was actively developing competing software. 7-ER-1162; *see also* 5-ER-692. The negotiations ended when Medallia abruptly stopped communicating with EchoSpan. 7-ER-1225–26.

**D.** **After a whistleblower discloses Medallia's theft, EchoSpan sues.**

Bank of America gave notice that it was terminating EchoSpan's contract in July 2021. 7-ER-1226–27. Months later, EchoSpan's CEO received a LinkedIn message from EchoSpan's former contact at Medallia, Rory Cameron. 7-ER-1225. Cameron proposed the two speak by phone. *Id.*

11

Cameron confessed. 7-ER-1225–26. He told EchoSpan's CEO that Medallia had not been truthful about its trial access to EchoSpan's system. 7-ER-1226. He apologized for not admitting Medallia's relationship with Bank of America and intimated that if he had been in EchoSpan's shoes, "the first thing he would have done was sue." 7-ER-1225–26.

EchoSpan sued Medallia in Georgia state court. *See* 3-ER-569. EchoSpan's complaint alleged twelve counts, including causes of action under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, and the Georgia Trade Secrets Act, Ga. Code Ann. §§ 10-1-762–64. 3-ER-582–97.

The matter was removed to the Northern District of Georgia and transferred to the Northern District of California. *See* 3-ER-561.

As the matter proceeded, EchoSpan identified nine trade secrets.[1] Most critical was Trade Secret No. 6, which was defined as the design and organization of the software's user interface for managing projects—*i.e.*, the system's administrative tool. 7-ER-1186. The administrative tool is the "hub" that the other trade secrets connect to and rely on to function. 9-ER-1796–97, 1801–02. ▮

▮▮▮▮▮▮▮▮

---

[1] The trade secrets were: (1) the "report template editor"; (2) "batch reporting" technology; (3) "legal scan" feature; (4) customization feature for selecting reviewers (called "raters"); (5) the "client management portal"; (6) the system's administrative tool; (7) the "project autopilot" mechanism for automating events; (8) the "coaching opportunities analyzer"; and (9) a "compilation of the features in alleged trade secrets 1 through 8." *See* 7-ER-1180–89 (trade secrets 1 through 8); 6-ER-884 (trade secret 9); 2-ER-87; see Argument § I.B.1.a, *infra*.

████████████████████████████████████████████████████

████████████████████████████████████ 11-ER-1983.

████████████████████████████████ *Id.*

The other components of the tool depend on this administrative engine—fact witnesses described the administrative tool as "the head of the octopus," the principal value driver of the system, and the single most important component of the tool. 9-ER-1797, 1801–02.

### E. The case proceeds to trial.

#### 1. Before trial, the district court twice rules that apportionment of damages is a question for the jury.

Before trial, Medallia moved to exclude EchoSpan's damages expert. 3-ER-482. In relevant part, Medallia argued that the expert's opinion was unreliable because, while he estimated the total amount of loss to EchoSpan and enrichment to Medallia, he did not break these down on a trade-secret-by-trade-secret basis. 3-ER-482, 489. Medallia argued the opinion gave the jury no way to apportion damages among trade secrets—essentially arguing that expert opinion pre-apportioning damages is required as a matter of law, but identifying no binding authority so holding. *See* 3-ER-490–91.

The court denied Medallia's motion in order to "let the jury weigh the competing admissible evidence at trial." 3-ER-385. It reasoned that "none" of the arguments in the motion "amount[] to a reason to exclude," and that the issues "can be pursued through vigorous cross-examination, competing evidence, and

13

argument." 3-ER-387. "Resolving the competing evidence and arguments," the court concluded, "is the duty of the jury." *Id.*

> **2. During trial, the court denies Medallia's motion for judgment as a matter of law on damages, again ruling that apportionment is a jury question.**

> > **a. After the close of EchoSpan's case-in-chief, the court grants judgment to Medallia as to two of nine alleged trade secrets.**

Trial lasted eight days. After EchoSpan's case-in-chief, Medallia moved for JMOL on in part on the basis that EchoSpan failed to prove misappropriation of its trade secrets. *See* 3-ER-362–63; 8-ER-1563–65.

The court granted JMOL as to trade secret 5, a function of EchoSpan's software that is not client-facing, but rather allows EchoSpan to manage the client experience. 3-ER-364–65. The court also granted judgment on trade secret 9, a compilation of the features in the other eight trade secrets, concluding EchoSpan had to prove all eight other trade secrets to win on trade secret 9. *Id.* at 366.

> > **b. The court rejects Medallia's argument that a defense judgment is required because EchoSpan's expert did not apportion damages by trade secret.**

Medallia also moved mid-trial to strike EchoSpan's damages expert and for JMOL on the basis that EchoSpan failed to prove or apportion damages. 8-ER-1566–70. In support, Medallia cited the same cases as its prior *Daubert* motion. It contended that, without expert testimony apportioning damages to each trade secret, EchoSpan could not receive any damages without proving theft of all nine

14

trade secrets, which Medallia said it couldn't do following the court's ruling on trade secrets 5 and 9. *Id.*; 9-ER-1730.

EchoSpan responded that the evidence showed that all of EchoSpan's trade secrets were interconnected, with trade secret 6 as the value-driving "brain of the operation" at the center of the system. 9-ER-1697–1701; *see id.* at 1698 (basis of the expert's testimony was "the value drivers"). Further, EchoSpan argued that its expert's had identified a total value that the jury could apportion, as it thought appropriate, based on the evidence. 9-ER-1699–1700, 1704.

The court denied Medallia's motion on the damages apportionment issue. The court declined to strike the expert testimony because doing so would be inconsistent with its prior *Daubert* ruling. 9-ER-1707. It deferred a ruling as to expert apportionment of damages because "it's more of a jury verdict and instruction issue," though the court said it was "a significant issue." 8-ER-1575. The court recognized that even if apportionment were required, EchoSpan's expert had provided relevant testimony "that the jury could use in starting out with a pie and working down from there potentially." 9-ER-1707; *see also id.* at 1730–31 (ruling that the verdict form was "appropriate" because it "require[d] apportionment of damages by trade secret").

The court made clear, however, that it would not permit EchoSpan's experts to offer opinions on apportionment or any other new topic. *See* 9-ER-1708.

15

### 3. In its rebuttal case, EchoSpan puts on additional evidence of damages.

On rebuttal, EchoSpan showed that trade secret 6, the administrative tool of EchoSpan's system, was the system's most significant value driver. EchoSpan demonstrated that trade secret 6 formed the core of the system and was the key to making everything else work.

EchoSpan's witnesses demonstrated that the whole system works with and depends upon the functionality of trade secret 6's administrative tool. *See, e.g.*, 9-ER-1795–97 (trade secret 6 "is the core. It enables everything. All of the other trade secrets are attached to it"). While all of EchoSpan's alleged trade secrets have value, "they can't do anything" without the administrative tool. *Id.* at 1802. EchoSpan thus did not license its system without the administrative tool included because the other features would not have worked without that tool. *Id.* at 1797–98. The administrative tool primarily "drives" the "overall commercial value of EchoSpan." *Id.* at 1803.

Additionally, both EchoSpan's and Medallia's experts provided testimony suggesting that if a single trade secret is the primary value driver of a product (here, the software system), then it would be appropriate to attribute the majority of the damages to that trade secret. Medallia's expert acknowledged that whether "the absence of a single feature means that all the other features can't function" would "be relevant to both a determination of value and separability." 9-ER-

16

1782.[2]  And while EchoSpan's expert testified that the technology functioned together "as a bundle," he highlighted the importance of primary value drivers in technology—thereby offering the jury guidance on how it could apportion damages by focusing on primary value drivers.  9-ER-1823–24.

> **4. The jury finds that Medallia misappropriated EchoSpan's administrative tool and awards $11.7 million in compensatory damages—half of the total EchoSpan had requested—as well as $14 million in exemplary damages.**

The jury returned a verdict for EchoSpan.  2-ER-323, 326.  It found that Medallia misappropriated the administrative tool—trade secret 6—willfully, wantonly, or with gross negligence.  *Id.*

The verdict form required the jury to apportion compensatory damages on a trade-secret-by-trade-secret basis.  For each trade secret, the jury was asked to individually determine liability and then calculate: (1) any harm to EchoSpan and (2) any unjust enrichment to Medallia from the misappropriation.  *See* 2-ER-319–26.  The jury instructions likewise directed the jury to determine an individual "calculable dollar value" for each misappropriated trade secret.  3-ER-345 ("If you find Medallia misappropriated *an* Alleged Trade Secret . . .").

As to the administrative tool, the trade secret that Medallia willfully and maliciously misappropriated, the jury found that Medallia was unjustly enriched by

---

[2] Medallia called its damages expert despite the Court's caution to Medallia that this decision could open the door to rebuttal.  *See* 9-ER-1705, 1708, 1741. Nevertheless, the Court sustained Medallia's objections to EchoSpan's attempt to introduce expert apportionment evidence in rebuttal.  *See id.* at 1823.

$11.7 million. 2-ER-323. Because the jury found that Medallia did not misappropriate any other trade secrets, it did not award any other compensatory damages. The jury's damages award, relating entirely to Medallia's unjust enrichment for misappropriating the administrative tool, thus totaled $11.7 million—half of the $23.37 million in total unjust enrichment damages calculated by EchoSpan's damages expert. *Id.*

The jury further awarded $14 million in exemplary damages, finding by clear and convincing evidence that Medallia's malfeasance was willful and malicious. 2-ER-326. Thus it awarded total damages of $25.7 million. *Id.*

The court entered a $25.7 million judgment for EchoSpan. *See* 2-ER-298.

**F.  After trial, the district court grants Medallia's renewed motion for judgment as a matter of law on damages.**

Medallia renewed its JMOL motion on four grounds: (1) insufficient evidence of liability; (2) insufficient evidence to support the jury's apportionment of damages; (3) insufficient evidence to support the $11.7 million compensatory damages award; and (4) insufficient evidence to support the $14 million exemplary damages award. *See* 2-ER-260–61. Medallia moved in the alternative for a new trial, arguing that the damages were too high. *Id.*

**1.  The court rules that because EchoSpan's experts did not explicitly apportion damages among the nine alleged trade secrets, the jury lacked an adequate basis on which to award damages as a matter of law.**

The district court upheld the jury's liability and punitive damages findings— *i.e.*, that EchoSpan had proved Medallia willfully and maliciously misappropriated

18

the administrative tool. 1-ER-17–21, 32–33.[3] But it granted Medallia's motion as to the jury's apportionment of damages. The court concluded that "EchoSpan's damages model fails because EchoSpan alleged multiple trade secrets, did not prove them all, and did not apportion damages between them." *Id.* at 22. Though it acknowledged that the "Ninth Circuit has not ruled on whether plaintiffs must apportion damages among trade secrets," the court ruled that EchoSpan had the burden as a matter of law to present expert apportionment testimony. *Id.*

The court recognized that this ruling was abrupt. At the hearing on Medallia's motion, it acknowledged that apportionment was a "surprise" and said that "maybe it would be more fair to just start over" because it would permit the parties to "apportion from the beginning," rather than "adjusting to the mid-trial changes in evidence and rulings." 2-ER-130–31. At the time, Medallia echoed this sentiment: "I do think there's a lot to be said for a new trial for the reasons precisely that [the court] articulated. I mean, this trial—sort of the key aspect of this trial really occurred at the eleventh hour or the eleventh and a half hour." *Id.* at 131–32.

### 2. The court enters an amended judgment, which EchoSpan appeals.

The court entered an amended judgment that—despite the jury's findings that "Medallia misappropriated Trade Secret 6" and was "willful and malicious" in

---

[3] The court also denied Medallia's alternative new trial request. 1-ER-29–33.

doing so—reduced EchoSpan's damages award from $25.7 million to zero. 1-ER-10, 33. EchoSpan appealed. 4-ER-599.

### G. After the amended judgment wipes out its entire $25.7 million damages award, EchoSpan moves for a new trial or, alternatively, for injunctive relief. The district court denies all relief.

EchoSpan moved for a new trial, arguing that the JMOL ruling had amounted to an unfair surprise of the sort that routinely warrants a new trial. 2-ER-97–108. EchoSpan alternatively sought, given the elimination of its $25.7 million damages award, to enjoin Medallia's use of the misappropriated trade secret. *Id.* at 107–08.

The court denied the motion. As to damages apportionment, the court found that there was no unfairness because the underlying JMOL was legally correct: Settled law says that a jury's award must have a reasonable basis, and, in the court's view, the jury's award could not have a reasonable basis absent expert apportionment testimony. 1-ER-6; *see id.* at 24–29. As to injunctive relief, which the court had previously denied based in part on the fact that EchoSpan had been awarded an adequate remedy in damages, the court declined to reconsider that ruling after eliminating the damages award. *Id.* at 6–7.

EchoSpan filed an amended notice of appeal from the order. 3-ER-595.

20

## SUMMARY OF THE ARGUMENT

1. In evaluating Medallia's JMOL motion, the district court was required to view the evidence and draw all inferences in EchoSpan's favor. It did the opposite. The court concluded that the jury did not apportion damages and lacked an adequate basis to do so. It was wrong on both counts. The jury *did* apportion damages—awarding, for misappropriation of the administrative tool, half of the total damages EchoSpan requested. The law does not require expert testimony giving the jury specific dollar amounts for each trade secret. The court's conclusion that the jury had no reasonable basis on which to apportion damages is thus inconsistent with both the record and the law. The JMOL should be reversed.

2. Basic rules of tort damages govern trade secret cases. Those rules say that *a defendant may* seek apportionment based on causes other than the misappropriated trade secret—not that *a plaintiff must* provide such evidence, as the district court ruled. The jury thus was not required to apportion damages at all. It nonetheless awarded 50 percent of the unjust enrichment damages EchoSpan sought. Because that award was within the range supported by the evidence, the JMOL was error as a matter of law.

3. In any event, the court abused its discretion by denying EchoSpan's post-JMOL new trial motion. The post-verdict retroactive requirement of expert apportionment testimony—while simultaneously prohibiting EchoSpan from providing that testimony, even to rebut Medallia's own expert—vacated EchoSpan's entire $25.7 million damages award. That was a miscarriage of

21

justice. The district court's summary denial of the motion on the ground that damages need a reasonable basis—essentially, on the basis that its underlying JMOL order was correct—was error as a matter of law.

## STANDARD OF REVIEW

**Judgment as a matter of law.** This Court reviews the grant of JMOL de novo. *Gray v. Hudson*, 28 F.4th 87, 95 (9th Cir. 2022). JMOL may not be granted unless "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014) (internal quotation marks and citation omitted). "[T]he court must 'draw all reasonable inferences in favor of the nonmoving party, keeping in mind that credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *In re First All. Mortg. Co.*, 471 F.3d 977, 991 (9th Cir. 2006) (citation omitted).

**New trial motion.** Ordinarily, the district court order denying a new trial is reviewed for an abuse of discretion. *Watec Co., Ltd. v. Liu*, 403 F.3d 645, 650 n.3 (9th Cir. 2005). This Court "may reverse the denial of the motion where the District Court has 'made a mistake of law,'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007), or where "the district court 'reaches a result that is illogical, implausible, or without support in the inferences that may be drawn from the record,'" *Williams v. Gaye*, 895 F.3d 1106, 1123 (9th Cir. 2018).

22

## ARGUMENT

**I.     The Judgment As A Matter Of Law Must Be Reversed Because The Jury's Damages Award Had An Adequate Basis In The Trial Evidence.**

**A.     Damages need only be proven with reasonable certainty and, once awarded by a jury, are entitled to great deference.**

A jury's damages award is entitled to great deference. *In re First All. Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006); *see also* Ga. Code Ann. § 51-12-12(a). Damages need not be calculated with absolute precision: They require only reasonable certainty as opposed to speculation, conjecture, or guesswork. *See, e.g., Kroger Co. v. U.S. Foodservice of Atlanta, Inc.*, 607 S.E.2d 177, 181 (Ga. Ct. App. 2004); *Electro-Miniatures Corp. v. Wendon Co.*, 771 F.2d 23, 27 (2d Cir. 1985); *see Holland Livestock Ranch v. United States*, 655 F.2d 1002, 1006 (9th Cir. 1981) ("Once injury has been proven, the fact that damages are not susceptible to precise measurement does not preclude recovery.").

Under both Georgia and federal law, for a court to invalidate a jury verdict based on a plaintiff's "failure to prove damages, there must be a complete absence of any competent evidence on this issue." *Canton Plaza, Inc. v. Regions Bank, Inc.*, 732 S.E.2d 449, 454 (Ga. Ct. App. 2012); *accord Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 252 (9th Cir. 1957) (requiring "a total failure or lack of proof on any essential element").[4]

---

[4] *Canton Plaza* involved a directed verdict; however, "[t]he standard for granting a directed verdict or a judgment notwithstanding the verdict are the same." *Pendley v. Pendley*, 302 S.E.2d 554, 554–55 (Ga. 1983).

A jury verdict on the amount of damages thus must be upheld "unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001); *Kroger*, 607 S.E.2d at 181.

An award is not based on speculation or guesswork if it is "within the range of evidence that was presented on damages." *Birch Prop. Partners, LLC v. Simpson*, 874 S.E.2d 814, 823 (Ga. Ct. App. 2022); *accord City of Phoenix v. Com/Systems, Inc.*, 706 F.2d 1033, 1039 (9th Cir. 1983) ("Since the damages awarded by the jury were well within the range of the evidence presented to the jury, we uphold the award"); *Holland Livestock Ranch*, 655 F.2d at 1006 ("the factfinder is allowed to make a reasonable inference of damages from the facts adduced").

"[A] jury can reduce an expert's calculations on damages even when unable to 'run the exact numbers and calculations of [a damages] model with "mathematical certainty."'" *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1268 (10th Cir. 2014) (citation omitted) (rejecting argument that the jury could not adjust expert "damages figure without his 'underlying calculations' or some other 'tool'"); *see Beasley v. Wachovia Bank*, 627 S.E.2d 417, 420 (Ga. Ct. App. 2006) (Georgia courts hold "only that the amount must be within the range of damages shown, not that the amount may only be a lesser amount if calculated according to some proven formula").

24

### B. The district court erred in concluding that the jury's award was speculative.

The jury found both that Medallia willfully and maliciously misappropriated EchoSpan's administrative tool (trade secret 6) and that EchoSpan proved Medallia's unjust enrichment with reasonable certainty. *See* 2-ER-323; 3-ER-345–47. Nonetheless, the district court vacated the jury's $25.7 million damages award and left EchoSpan with nothing. *See* 1-ER-28–29. The court concluded both (1) that the jury did not apportion damages; and (2) that the jury could not award damages for theft of one trade secret without expert opinion explicitly apportioning damages among all alleged trade secrets. *See* 1-ER-24–28.

The court was wrong on both counts. EchoSpan sought $23.4 million in unjust enrichment damages, and the jury awarded *half that amount*—not the full amount. It also had a sufficient evidentiary basis to do so.

#### 1. The jury apportioned its damages award, and that apportioned award is supported by the trial evidence.

##### a. The district court failed to view the award in the light most favorable to EchoSpan.

Viewing the evidence in the light most favorable to the jury's verdict, it is clear that the jury apportioned damages. The district court granted JMOL on the basis that the jury *did not* apportion, but rather awarded, for misappropriation of the administrative tool only, the cumulative total EchoSpan sought for all nine trade secrets. *See* 1-ER-26–29. This conclusion is contrary to the record and the law.

EchoSpan's expert testified that there were four categories of available compensatory damages:

- EchoSpan's *lost profits*: $5,308,889.

- Medallia's *ill-gotten gains*: $11,574,146.

- Medallia's *head start*: $8,916,930.

- Medallia's *saved costs*: $2,874,957.

8-ER-1442–46, 1457, 1459, 1469. Of the four categories, the final three—ill-gotten gains, head start, and saved costs—represent three distinct elements of Medallia's unjust enrichment, totaling $23,366,033. 8-ER-1442–46, 1457, 1459, 1469, 1509; 9-ER-1891 (asking for up to $23,366,033).

The jury found that Medallia misappropriated trade secret 6, the administrative tool. 2-ER-323. It further found that Medallia's misappropriation unjustly enriched it by $11.7 million—*i.e.*, half of the nearly $23.4 million in total unjust enrichment damages EchoSpan requested. *Id.*

Seeking to overturn the jury's verdict, Medallia argued that the jury instead arrived at the $11.7 million figure by awarding the full amount of two sub-categories of unjust enrichment damages—head start and saved costs—which together total about $65,000 more than the jury's $11.7 million award.[5] *See* 2-ER-260, 273, 288–89; 2-ER-120 (Medallia incorrectly referring to $11.7 million as "the full amount that had been attributed to" all nine trade secrets).

---

[5] $8,916,930 plus $2,874,957 is $11,764,887.

First of all, EchoSpan's explanation is the more reasonable one. Medallia's math doesn't add up:

- EchoSpan's explanation differs from the jury's $11.7 million verdict by less than $17,000 (half of the total unjust enrichment damages is $11,683,016.50).

- On the other hand, Medallia's proposed explanation differs from the jury's actual award by nearly *four times* that amount, or about $65,000. *See* n. 5, *supra*.

More fundamentally, irrespective of which party's explanation is "more" reasonable, the law permits only one conclusion in evaluating a JNOV motion: that the jury apportioned damages. The district court cannot substitute its judgment for that of the jury by reweighing evidence or drawing inferences against the judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Medallia's argument fails because it requires the court to impermissibly draw inferences in *Medallia's* favor and against the judgment. *See First All. Mortg. Co.*, 471 F.3d at 991.

The district court nonetheless accepted Medallia's argument and assumed that the jury did not "lower its award to adjust for the trade secrets it rejected," and instead "award[ed] the *entire* amount to [trade secret 6]." 1-ER-26; *see* 1-ER-29 (agreeing with Medallia that $8.9 million of the $11.7 million award "'correspond[ed]' to head start benefits"). Like Medallia, the district court inferred—for the purpose of *undermining* the jury's verdict—that by awarding 50

27

percent of the unjust enrichment damages the jury actually intended to award 100 percent of two sub-categories of those damages. Yet the district court could not accept Medallia's argument unless the evidence *compelled* Medallia's conclusion, *see Escriba*, 743 F.3d at 1242—something it plainly did not do.

The jury was not asked to specify the elements of its unjust enrichment award (*e.g.*, saved costs, head start) for any given trade secret—only to award unjust enrichment damages on a trade-secret-by-trade-secret basis. *See* 2-ER-319–26; 9-ER-1730–31 (verdict form "require[d] apportionment of damages by trade secret"). The jury was explicitly instructed that it could combine different unjust enrichment sub-categories into a lump sum for each trade secret. 3-ER-345. That's what the jury did. Neither Medallia nor the court could possibly know— as Medallia argued and the court concluded—that the jury awarded 100 percent of the head-start benefit EchoSpan presented, 100 percent of the saved costs, and none of the ill-gotten gains.

Nothing in the record compels the conclusion that the jury did not apportion—indeed, the record amply demonstrates otherwise—so the district court's adverse inference to that effect was error. *Escriba*, 743 F.3d at 1242; *see ClearOne Commc'ns, Inc. v Biamp Sys.*, 653 F.3d 1163, 1180–81 (10th Cir. 2011) (reversing on the ground that the district court erred by inferring the jury did not apportion damages; although that inference was "plausible, it [was] not inescapable").

28

> **b.      Drawing more adverse inferences, the district court disregarded ample evidence of each trade secret's respective function and relative importance from which the jury could apportion damages.**

Not only did the jury apportion its damages award—attributing 50 percent of the total unjust enrichment damages to the administrative tool—but it also had an ample evidentiary basis on which to do so.  EchoSpan put on evidence of nine alleged trade secrets and their relative roles in, and importance to, the overall functioning of the system.  The jury learned that EchoSpan's system includes:

1. The report template editor, which allows clients to build highly customizable templates for a variety of reports.  7-ER-1180.

2. Batch reporting, an always-running script that facilitates data integrity. 7-ER-1181.

3. Legal scan, an automated feature that finds and corrects feedback that could be perceived as discriminatory.  7-ER-1183.

4. Many customization options for selecting raters.  7-ER-1184.

5. A client management portal—the EchoSpan side of the tool—which allows EchoSpan to manage its clients' experience.  7-ER-1185.

6. The administrative tool, which supports localization in more than 100 languages, and is organized in a manner that encourages efficiency and limits required trainings.  This is the core platform to which all other functionalities connect.  7-ER-1186; 9-ER-1795–1801.

7. Project autopilot, which is a mechanism for automating events within a project. 7-ER-1187.

8. A coaching opportunities analyzer, which "identif[ies] people in an organization that need help" and can "alert someone in the organization, or [EchoSpan], to provide them resources." 7-ER-1189.

9. A compilation of the features in the other trade secrets. 7-ER-1190. That compilation is EchoSpan's "competitive edge" in the market—the whole package that EchoSpan sells to customers as a unit—rather than the discrete features, which aren't usable on an individual basis. *Id.*

In other words, the jury learned how each trade secret worked individually, what each brought to the system overall, and how they all interacted to create a unified product.

EchoSpan's trial presentation provided the jury particular insight into trade secret 6, the administrative tool, and offered evidence from which the jury could determine the portion of the total damages attributable to trade secret 6.

EchoSpan's owner (a software developer) and EchoSpan's senior software developer both testified that trade secret 6 was central to and the primary driver of the entire system. *See* 9-ER-1622, 1636, 1802 (confirming TS6 drove the system overall). The jury learned that the administrative tool is the core platform that "enables" the whole system. *Id.* at 1797 ("So the administrative tool, as we looked at it last week, is the core. It enables everything. All of the other trade secrets are attached to it."). Without the administrative tool, none of the other functions

30

would work. *Id.* at 1805–06; *see also id.* at 1634 ("[T]he admin tool is what makes everything work. If you do not have the admin tool, there's nothing that EchoSpan can deliver."). In other words, the administrative tool essentially *is* the system; all the other trade secrets are functionalities that plug into the administrative tool, but which had "probably close to zero" value without the capability provided by the administrative tool. *Id.* at 1797–98, 1801–03; *id.* at 1634–35.

Both sides' testimony was likewise consistent with assigning substantial damages to a single trade secret if it was the primary value driver of a product. *See* 9-ER-1782 (Medallia's damages expert acknowledged that whether "the absence of a single feature means that all the other features can't function" would "be relevant to both a determination of value and separability"); 9-ER-1823–24 (EchoSpan's expert testified that "when you have a group of technology or a group of intangible assets, there's one asset that may be a bigger value driver than another").

To find otherwise, the district court *again* deviated from the requirement that it construe the evidence and draw inferences in favor of the verdict. The court found that because trade secret 5 (the client management tool) is not sold to EchoSpan's customers, it is separate from the system. 1-ER-27. On that basis, the court concluded that the total damages estimate, to the extent it incorporates trade secret 5, cannot inform the jury's determination of damages. The evidence and reasonable inferences say otherwise.

31

Trade secret 5, on which the court granted JMOL mid-trial, was not separate from EchoSpan's integrated system. 8-ER-1578. It is irrelevant that the other trade secrets were client-facing, while trade secret 5 was not. Nothing about that rebuts the fact, supported by trial evidence, that the trade secrets together comprised a system that couldn't function properly if any one component was absent. 8-ER-1507–09; 9-ER-1727–28, 1797–98; *see* 7-ER-1190.

The evidence regarding the system and all of its functions and capabilities—viewed properly—gave the jury ample basis to work down from the overall damages figure to which EchoSpan's expert testified. Medallia stole that system, and the jury was capable of reducing the overall damages figure to account for trade secret 5 and any other alleged trade secret not included in its final verdict. That is precisely what the jury did when it awarded only half of the requested damages for misappropriation of trade secret 6, the administrative tool. *See* § I.B.1.a, *supra*.

The jury's 50-percent reduction was consistent with the law of reasonable certainty for damages under both Georgia and federal law on trade secrets.

Georgia courts have repeatedly affirmed where the jury's damages award falls somewhere within the range of damages supported by the evidence. For instance, in *Trotman v. Velociteach Project Management, LLC*, 715 S.E.2d 449 (Ga. Ct. App. 2011), the plaintiff offered project management training courses. The jury awarded plaintiff $134,000 in unjust enrichment damages against the defendant competitor. *Id.* at 453. The competitor challenged the award on

32

the basis that it lacked reasonable certainty. *Id.* at 455–456. The appellate court rejected that challenge. Noting that the evidence showed that, by misappropriating trade secrets, the defendant "avoided paying $1,000 in cost for each kit he used to teach" students and that he taught over 300 students—i.e., over $300,000 in damages—the court concluded that "[t]his evidence authorized the jury's damages award" of $134,000. *Id.* at 456; *see also White v. Arthur Enters., Inc.*, 464 S.E.2d 225 (Ga. Ct. App. 1995) (holding, in trade secret action, that where evidence showed stolen information had $90,000 value, an award of $18,000 each against two defendants "was well within the range of the evidence, [and] shall be affirmed").

Federal trade secret cases are to the same effect. *See, e.g.*, *Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1018 (10th Cir. 2008) (holding court "may not second guess the award" where "the damages awarded by the jury fall within the range permitted by the evidence admitted at trial").

The jury's damages award here was well within the range of the evidence. The jury had all that it needed to reach a damages figure: Extensive testimony on the nature and relative importance of the nine alleged trade secrets—with significant emphasis on trade secret 6, the administrative tool—and testimony regarding the extent to which Medallia was unjustly enriched by stealing those secrets. The jury awarded a fraction of that total. It had a reasonable evidentiary basis for doing so and the district court erred in concluding otherwise.

———◆———

33

The district court court's grant of JMOL turned on a significant evidentiary inference drawn *against* the verdict. That was wrong. Drawing all reasonable inferences in favor of the jury's verdict, the evidence supported the jury's 50-percent apportionment of Medallia's total unjust enrichment damages to the administrative tool. It was error to grant Medallia's motion.

### 2. The district court imposed incorrect evidentiary requirements.

In addition to ruling that the jury did not apportion damages, the JMOL order reasons that the jury *could not* apportion damages. According to the court, the jury's apportionment was mere speculation because it rested on "no expert apportionment and non-expert witnesses striving to set apart a single trade secret." 1-ER-24–25. The district court erred. Its conclusion that only expert testimony can provide a reasonable basis for damages apportionment is not, and should not be, the law of this Circuit.

### a. Trade secret damages are subject to a flexible standard that does not require an expert to explicitly assign dollar amounts to each alleged trade secret.

It is well established that courts take a "flexible and imaginative approach" to damages calculation in trade secret cases. *See, e.g.*, *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 809 (2d Cir. 2023); *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013). Courts do not preclude recovery "even where the damages are uncertain." *Wellogix*, 716 F.3d at 879 (quotation marks, brackets, and citation omitted). It is "'enough if the evidence show[s] the extent of the damages as a matter of just and reasonable

34

inference, although the result be only approximate.'" *Id.* (quoting *DSC Commc'ns Corp. v. Next Level Commc'ns*, 107 F.3d 322, 330 (5th Cir. 1997)).

In *Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, 53 F.4th 368 (6th Cir. 2022), the Sixth Circuit emphasized the jury's discretion regarding the *amount* of damages in trade secret cases. The jury awarded two kinds of damages for the misappropriation of one of several trade secrets: plaintiff's research-and-development costs (*i.e.*, its "actual loss") and defendant's unjust enrichment. *Id.* at 377, 387. Like Medallia, the defendant argued that the damages award was calculated improperly based on the expert's consideration of all asserted trade secrets, even though the jury had awarded damages for only one trade secret. *Id.* at 386, 392–93.[6]

The Sixth Circuit rejected that argument, holding that the jury had an adequate basis on which to award both categories of damages. *See Caudill*, 53 F.4th at 389–90, 392–93. The court acknowledged the rule that "[e]ach trade secrets 'case requires a flexible and imaginative approach to the problem of damages.'" *Id.* at 387 (quotation omitted). "This flexibility means that 'the plaintiff is required to prove the amount of such loss with only as much certainty as is reasonable under the circumstances.'" *Id.* (quoting Restatement (Third) of Unfair Competition § 45 cmt. (b) (1995)); *see also White*, 464 S.E.2d at 225–26 (Georgia trade secret law requires only "reasonable certainty").

---

[6] *Caudill* arose under the Kentucky Trade Secrets Act, which is "nearly identical" to the Federal Defend Trade Secrets Act. *Caudill*, 53 F.4th at 381 n. 2.

Regarding research-and-development damages, the court upheld the jury's award of all such costs incurred during the period in which the defecting employee worked for plaintiff. *Caudill*, 53 F.4th at 386. The court highlighted the fact that the jury had "awarded far less than the total amount requested," and observed that the jury could have inferred from the conflicting trial evidence that all research-and-development costs went toward the misappropriated trade secret, which provided further evidence for the verdict. *Id.* at 387–88, 389–90.

As for unjust enrichment—the only kind of damages at issue here—the Sixth Circuit upheld the jury's award of *all* of the defendant's net profits on four products because there was trial evidence from which the jury could conclude that all four incorporated the misappropriated trade secret. *Caudill*, 53 F.4th at 392–93. So too, here, the jury concluded that Medallia's competing product incorporated EchoSpan's misappropriated trade secret. 2-ER-323.

Similarly, in *Russo*, 550 F.3d 1004, the Tenth Circuit upheld a jury verdict based on an expert unjust enrichment opinion that did not differentiate between profits attributable to the trade secret and those attributable to other factors. *Id.* at 1018. Plaintiff argued he was entitled to full net profits of $32 million; defendant argued instead that the trade secret "added nothing, or very little[,] of value[] to its independent work." *Id.* Affirming, the court noted "the jury found the truth to lie somewhere in between the extremes suggested by the evidence received at trial, returning an award that represented 53% of the damages [plaintiff] sought." *Id.* "When the damages awarded by the jury fall within the range permitted by the

36

evidence admitted at trial (and whose admission is unchallenged on appeal), we may not second guess the award." *Id.*

Prior to the ruling below, the Northern District of California had joined in the chorus of courts recognizing the flexibility of damages in trade secret cases. In *ATS Products Inc. v. Ghiorso*, the jury found that the defendant misappropriated seven out of thirteen trade secrets. 2012 WL 253315, at *1 (N.D. Cal. Jan. 26, 2012). The defendant argued that a damages award was speculative because there was no expert testimony on how to apportion damages on a trade-secret-by-trade-secret basis. *Id.* The court rejected that argument, reasoning that trade-secret "damages need not be calculated with absolute precision." *Id.*

The court further recognized that, in the Ninth Circuit, the inquiry into whether damages are impermissibly speculative focuses on whether a category of damages is warranted, rather than on the *amount* of those damages: "The general rule that prohibits evidence of speculative profits does not apply to uncertainty as to the *amount* of the profits which would have been derived, but to uncertainty or speculation as to *whether* loss of profits was the result of the wrong and whether any such profits would have been derived at all." *ATS Products*, 2012 WL 253315, at *1 (quoting *Tri-Tron Int'l v. Velto*, 525 F.2d 432, 437 (9th Cir. 1975) (internal citations omitted)). Unlike the certainty required for damages to be available, the amount of damages "need only rest on a 'reasonable basis.'" *Id.* (quoting *Tri-Tron*, 525 F.2d at 436).

37

In *ATS Products*, the evidence of damages was relatively scant but sufficient in light of the deferential standard. The overall bundle of trade secrets in that case had been purchased for $500,000. *ATS Prods.*, 2012 WL 253315, at *1. There was also "some evidence of the costs Defendants incurred." *Id.* The court noted that the jury was also instructed that it could only award lost profits that were "reasonably certain." *Id.* It upheld the award under that flexible standard on the ground that the amount was neither grossly excessive nor unreasonable in light of the evidence.[7] *Id.*; *see Yeti by Molly*, 259 F.3d at 1107 ("We must uphold the jury's finding of the amount of damages unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.").

Other cases are in accord. In *BladeRoom Group, Ltd. v. Facebook, Inc.* (*BladeRoom I*), the Northern District once again recognized that an expert is not required to "assign damages amongst the trade secrets alleged for his or her opinion to be admissible." 2018 WL 1611835, at *6 (N.D. Cal. Apr. 3, 2018). The court later declined to grant judgment as a matter of law based on lack of apportionment. *See BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 331 F. Supp. 3d 977, 989–90 (N.D. Cal. 2018) (*BladeRoom II*), *vacated on other grounds*, 20 F.4th 1231 (9th Cir. 2021); *cf. Equate Media, Inc. v. Suthar*, 2023 WL 7297328, at *1–2

---

[7] The jury found that the plaintiff's damages were $350,000, of which the defendant was responsible for $175,000. *See ATS Prods., Inc. v. Ghiorso*, 3:10-cv-4880-BZ, ECF 247 (N.D. Cal. Dec. 12, 2011); 2-ER-153.

(9th Cir. Nov. 6, 2023) (reversing JNOV and reinstating jury's apportionment of damages among defendants despite no evidence showing a "precise breakdown").

These cases are consistent with Georgia law:  There, too, "[t]he rule against recovery of speculative damages relates primarily to speculation regarding proximate cause rather than extent.  Once a plaintiff establishes that damages proximately flow from the defendant's alleged conduct, mere difficulty in fixing their exact amount should not be a legal obstacle to recovery."  *Wright v. Apartment Inv. & Mgmt. Co.*, 726 S.E.2d 779, 785 (Ga. Ct. App. 2012); *see also, e.g.*, *McMillian v. McMillian*, 713 S.E.2d 920, 923–24 (Ga. Ct. App. 2011) ("[D]ifficulty in calculating precisely the damages sustained will not preclude their recovery."); *Owens v. Novae, LLC*, 850 S.E.2d 457, 462 (Ga. Ct. App. 2020) ("'[T]he amount of damages need not be calculated with exact mathematical certainty.'" (citation omitted)).  "'[I]f a plaintiff can show with reasonable certainty the total amount of damages and the degree to which those damages are attributable to defendant, that is sufficient to support an award.'"  *Wright* at 785.

> **b.**       **Rather than adhering to the flexible damages standard, the district court followed an older case that applied a stricter standard under materially different circumstances.**

The district court rejected these cases and the flexible standard they applied in favor of an older ruling.  1-ER-22–29 (discussing *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064 (N.D. Cal. 2005), *aff'd*, 221 F. App'x 996 (Fed. Cir. 2007)).  In *O2 Micro*, the court concluded that the jury's apportionment of damages was merely guesswork because no expert explicitly told

the jury how to apportion damages. The district court was wrong to rely on *O2 Micro*, which is both wrong on the law and materially inapposite.

In *O2 Micro*, the jury awarded damages on one trade secret out of eleven, awarding three-quarters of the damages that plaintiff had sought for all eleven combined. *See* 399 F. Supp. 2d at 1076–77. Before trial, the court told plaintiff that its expert would need to apportion damages on a trade-secret-by-trade-secret basis. *Id.* at 1076. At trial, the expert instead testified to the combined damages for all trade secrets collectively. *Id.* The plaintiff supplemented with employee testimony on the value of the misappropriated trade secret. *Id.* at 1076–77. The district court ruled that lay testimony wouldn't support the jury's verdict because no witness expressly testified that the misappropriated trade secret was worth 75 percent of all the trade secrets to the defendant in dollar terms. *Id.*

*O2 Micro* involved California law; this case does not. That, standing on its own, is not necessarily an issue. The problem is that *O2 Micro* is wrong even on California law: As multiple cases have recognized, "California does not require an apportionment of damages to individual trade secrets." *Skye Orthobiologics, LLC v. CTM Biomedical, LLC*, 2023 WL 5667558, at *10 (C.D. Cal. Aug. 9, 2023); *accord BladeRoom II*, 331 F. Supp. 3d at 989 (same); *SPS Techs., LLC v. Briles Aerospace, Inc.*, 2021 WL 4913509, at *3 (C.D. Cal. Sept. 8, 2021) (same). In support of this conclusion, *BladeRoom* interpreted a trade secret damages statute, Cal. Civ. Code § 3426.3, which is the same in all material respects to

40

the Georgia statute at issue here, Ga. Code Ann. § 10-1-763. *BladeRoom I*, 2018 WL 1611835 at *6 (cited by *BladeRoom II*, 331 F. Supp. 3d at 989).

*O2 Micro* doesn't cite California Civil Code section 3426.3. 399 F. Supp. 2d at 1076–77. Nor does it cite a single case requiring expert apportionment testimony. *Id.* In fact, other than citing two *non-apportionment* cases for the general proposition that damages need "a 'reasonable basis,'" the court cited no authority at all. *Id.* It invented an expert apportionment requirement contrary to California law—and found nowhere in Georgia law.

The district court nonetheless followed *O2 Micro*, not *Caudill*—and never mentioned more recent contrary authority like *ATS Products* and *BladeRoom*.[8] It further concluded that *O2 Micro* is, relative to the facts of this case, "a near-perfect bullseye." 1-ER-24.

Not so. *O2 Micro* differs from this case in material ways. Thus, even if *O2 Micro* were right on the law—it's not—these significant distinctions reveal why it has no application here. Expert testimony spoon-feeding the jury damages figures for each trade secret was not required, and its absence cannot justify throwing out an entire $25.7 million verdict.

**Highly technical.** The trade secrets at issue in *O2 Micro* differed fundamentally from those at issue here. *O2 Micro* involved patent and trade secret

---

[8] That *O2 Micro* was published and *ATS Products* was not published is irrelevant because no district court opinion is binding precedent. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011).

41

claims between manufacturers of liquid crystal display (*i.e.*, LCD) panels.  399 F. Supp. 2d at 1069.  The claimed trade secrets included a misappropriated microchip-related trade secret defined as "'O2 Micro's design and selection of a transformer that has one or more of the following characteristics with an inverter model that includes a OZ960, OZ961, OZ969A, OZ970 or OZ9RZ controller . . .'" *Id.* at 1072 (emphasis omitted).  Others, which the jury found were *not* misappropriated, related to (1) "O2 Micro's method of using multiplexing functions in the pins of the OZ9RR inverter controllers so that one pin of the OZ9RR inverter controller may support multiple functions co-existing in an inverter application"; (2) "the desirability and benefits of a controller that O2 Micro was developing"; (3) "information about cost and configuration that is found in O2 Micro data sheets and demonstration boards."  *Id.* at 1075.  As these definitions show, the trade secrets in *O2 Micro* involved highly specialized technological applications and related data that lay jurors could not reasonably be expected to understand without expert assistance.

By contrast, here, the alleged trade secrets were explainable to the jury in lay terms.  They involved various familiar features of a 360-review software system—things like a feature that monitors for potential legal red flags, a system for selecting employee reviewers, and the overall design and organization of the user interface, *i.e.*, the misappropriated administrative tool.  *See* § I.B.1.a, *supra*.

**No unified system.**  In *O2 Micro*, there was no unified system:  Some trade secrets involved hyper-technical features of transformers and inverters, while

others involved cost information in data sheets, and still others involved matters in development. *See* 399 F. Supp. 2d at 1072–75. It is true that "*O2 Micro* witnesses referred to the [misappropriated] trade secret as 'the heart' and the 'single largest component'" in an inverter. 1-ER-23 (quoting 399 F. Supp. 2d at 1077). But not all the trade secrets were features or components of the inverter at issue. Testimony regarding the misappropriated trade secret's relative importance to the inverter said nothing about the value of other trade secrets extrinsic to it, like cost-related information spreadsheets and other matters still in development. *See* 399 F. Supp. 2d at 1075.

Again, this case is entirely different: The evidence shows that all the trade secrets were part of *a unified system* in which each component trade secret was a feature that had a unique role—whether user-facing or EchoSpan-facing—and relative importance in the system's overall operation. *See* 7-ER-1178–90; 9-ER-1634–37, 1795–98, 1800–03. This testimony, in the context of an integrated system of which all trade secrets were a component, gave the jury a reasonable basis on which to apportion damages.

In fact, the district court went even further than *O2 Micro*, faulting EchoSpan for providing "no testimony about the financial importance of [trade secret 6] to EchoSpan." 1-ER-24. Even *O2 Micro* recognized that such testimony is irrelevant to unjust enrichment because it says nothing about the value to the defendant. *See O2 Micro*, 399 F. Supp. 2d at 1077. Here, too, this case differs from *O2 Micro*: Witness testimony specifically discussed the administrative tool

43

as the primary driver of EchoSpan's "overall commercial value"—not merely internal value to EchoSpan. 9-ER-1803.

Not only did the court adopt an improper mathematical-certainty requirement for trade secret damages, it also went beyond that standard to demand irrelevant information.

———◆———

This Circuit has never held that expert apportionment testimony is required in trade secret misappropriation cases. Nor has any Georgia case. And numerous cases have found that no such requirement exists. The district court's lone contrary authority is both wrong on the law and inapposite. The jury was instructed that it could only award damages that were reasonably certain. It acted consistent with those instructions and must be presumed to have followed them. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("[J]uries are presumed to follow their instructions").

The amended judgment should be reversed and the jury's verdict reinstated.

**II.     The Judgment As A Matter Of Law Must Be Reversed For The Independent Reason That The Jury Was Not Required To Apportion Damages And Its Award Was Well Within The Range Of Evidence.**

Under settled law, a defendant seeking to reduce its liability may show that some portion of damages is attributable to causes other than the misappropriated trade secret.  Where the defendant fails to present that evidence, or the jury disbelieves it, no apportionment is required.  That too requires reversal.

**A.     The district court improperly required EchoSpan to prove apportionment was impossible.**

EchoSpan has argued throughout this case that it had no obligation to pre-apportion damages for the jury.  *E.g.*, 9-ER-1727–29.  Trade secret law does not require plaintiffs to do so.

Instead, the ordinary tort rules govern apportionment of damages. *See* Restatement (Third) of Unfair Competition § 45 cmt. (f) (1995) ("The general rules governing accountings of profits are applicable in trade secret actions.").[9] Under those rules, when a single harm has multiple causes, a defendant can seek apportionment so that it is liable only for the proportion of harm it tortiously caused.  *See Stevens v. Bangor & Aroostook RR. Co.*, 97 F.3d 594, 602 (1st Cir. 1996).

Thus, in trade secret cases, the *party urging apportionment* must show that the damages should be apportioned.  *See, e.g.*, *Motorola Sols., Inc. v. Hytera*

---

[9] Georgia courts rely on the Restatement in trade secret actions.  *See Essex Grp., Inc. v. Southwire Co.*, 501 S.E.2d 501, 503 (Ga. 1998).

*Commc'ns Corp. Ltd.*, 108 F.4th 458, 476–77, 490 (7th Cir. 2024) (holding that under the DTSA, once the plaintiff proves the defendant's profits, the *defendant* may seek apportionment); *Jenson*, 130 F.3d at 1294 ("[P]laintiffs bear no burden to prove apportionment."); *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, 249 F.App'x 63, 78–79 (10th Cir. 2007) (holding that the defendant has the burden to prove apportionment in trade secret cases; collecting cases). As the Restatement recognizes: "The plaintiff is entitled to recover the defendant's net profits. The plaintiff has the burden of establishing the defendant's sales; *the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits*." Restatement (Third) of Unfair Competition § 45 cmt. (f) (1995) (emphasis added); *see* Restatement (Second) of Torts § 433B (1965) (similar).

This rule makes sense. A defendant can't steal and copy its competitor's product—trade secrets and all—and enrich itself by millions of dollars based on that wrongful conduct, only to turn around and say the injured plaintiff-competitor gets nothing because some elements of the stolen product weren't secret. That is precisely what Medallia has tried to do throughout this case. *E.g.*, 3-ER-387. Even more, the defendant "is in the best position" to demonstrate which portions of its unjust enrichment are, in fact, *just*—that is, attributable to something other than misappropriation. *Cartel Asset Mgmt.*, 249 F. App'x at 79. The law thus rightly puts the onus on the wrongdoer defendant to prove any portion of its ill-gotten

46

gains not attributable to the stolen trade secrets. *See, e.g.*, *Motorola*, 108 F.4th at 477, 490.

This Court affirmed an unapportioned damages award under analogous circumstances in *Nintendo of America, Inc. v. Dragon Pacific Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994), a copyright case. Courts frequently observe the similarity between damages under the DTSA and the Copyright Act. *See, e.g.*, *Motorola*, 108 F.4th at 490 ("The statutory language for the DTSA's first two methods of calculating damages parallels the Copyright Act.").

The *Nintendo* plaintiff sued for copyright and trademark infringement but didn't win on every claim. 40 F.3d at 1012. The district court awarded the full amount of damages, without reduction based on the unproven claims. *See id.* at 1009–10. The defendant appealed, arguing the court erred in refusing to apportion damages. *See id.* at 1011–12. This Court held that there was no basis to reduce the damage award because the defendant "did not meet his burden of presenting any evidence at trial on how to apportion damages." *Id.*

Here, instead of applying settled law on apportionment in trade secret cases, the district court explicitly borrowed its apportionment approach from patent law. *See* 9-ER-1731 (noting that the apportionment concept is "coming from a patent case"). But patent law is fundamentally different on this subject: Unlike in trade secret cases it is the patentee-plaintiff's burden—rather than the defendant's burden—to provide evidence for the factfinder to use in apportioning. *E.g.*, *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1376 (Fed. Cir. 2021). This

47

further explains the anomalous outcome in *O2 Micro*, which was a patent case. *See O2 Micro*, 399 F. Supp. 2d at 1080–88. While that court did not cite any authority supporting its apportionment ruling, which runs afoul of California law, *see* § I.B.2.b, *supra*, the ruling is consistent with the patent approach to damages.

Medallia stole EchoSpan's proprietary software product—including multiple alleged trade secrets—and unjustly enriched itself to the tune of $23 million. *See* § I.B.1.a, *supra*. There was evidence that those trade secrets—whether client-facing or EchoSpan-facing—were an interdependent bundle and that EchoSpan's system couldn't function properly if any one secret was absent. 8-ER-1499, 1507–09; 9-ER-1727–28, 1796–1801; see § I.B.1.b, *supra*.

Medallia presented no evidence apportioning damages by trade secrets. Even if it had, "the jury was free to disbelieve, and therefore to disregard, that evidence." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001). Nonetheless, in granting JMOL, the district court retroactively required *EchoSpan* to present precise expert apportionment testimony because EchoSpan didn't win on all alleged trade secrets. *See* 9-ER-1731.

That was error. Even assuming for the sake of argument that there was a failure of proof as to apportionment—*but see* § I, *supra*—that failure of proof was *Medallia's*, not EchoSpan's. The jury thus was not required to award anything less than the total unjust enrichment damages. *See, e.g.*, *Caudill*, 53 F.4th at 392–93 (awarding full unjust enrichment damages in the amount of total net profits on four products incorporating misappropriated trade secret).

48

**B. Because the jury's award was within the range of damages shown, judgment as a matter of law was improper.**

Even though the jury could have awarded the full unjust enrichment amount, it chose to award only half of what EchoSpan sought. *See* § I.B.1.a, *supra*.

This is entirely consistent with Georgia law on trade secret damages. *See Trotman*, 715 S.E.2d at 453, 456 (evidence showing over $300,000 in unjust enrichment "authorized the jury's damages award" of $134,000); *White*, 464 S.E.2d at 225–26 (affirming award of $18,000 each against two defendants based on evidence of $90,000 in unjust enrichment: "Because the jury's award of damages was well within the range of the evidence, it shall be affirmed"); *cf. Beasley*, 627 S.E.2d at 420 (Georgia courts hold "only that the amount must be within the range of damages shown, not that the amount may only be a lesser amount if calculated according to some proven formula").

It is also consistent with federal law. *See Raynor Bros. v. Am. Cyanimid Co.*, 695 F.2d 382, 385 (9th Cir. 1982) (affirming verdict for half the amount shown by plaintiff's evidence: "The jury's verdict should be accepted if it could reasonably have been reached"); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1366 (9th Cir. 1986) ("Where, as here, the jury's verdicts find substantial support in the record and lie within the range sustainable by the proof, we will not 'play Monday morning quarterback' and supplant the jury's evaluation of the complex and conflicting evidence with our own").

The jury's award was well within the range of the evidence. The JMOL must be reversed.

**III. At A Minimum, A New Trial On Damages Is Required To Prevent A Miscarriage Of Justice.**

Even if the court's decision to toss out the entire jury verdict were not error for all the reasons stated above, its refusal to grant EchoSpan a new trial was an abuse of discretion under the circumstances.

**A. A new trial can be granted "on any ground necessary to prevent a miscarriage of justice."**

"The trial judge is ultimately responsible for the conduct of the litigation, and is also responsible for ensuring that a party is not a victim of a miscarriage of justice." *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990). Thus, "[u]ltimately, the district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014); see *City of Phoenix*, 706 F.2d at 1036 ("A trial judge may grant a new trial in order to prevent fundamental unfairness or a miscarriage of justice."). A new trial may be appropriate where unfair surprise "deprives the party of a fair hearing" if the moving party shows "'reasonably genuine surprise'" inconsistent with substantial justice, resulting in actual prejudice. *Twigg v. Norton Co.*, 894 F.2d 672, 675 (4th Cir. 1990) (quoting *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 495 (2d Cir. 1985)).

50

**B.** **The district court changed the playing field for trial at the "eleventh and a half hour." EchoSpan had no ability to anticipate or adjust to the new rules of the game.**

The question of apportionment is unsettled in this Circuit, with the most recent district court authority *not* requiring expert testimony specifically apportioning damages among trade secrets. *See ATS Prods.*, 2012 WL 253315, at *1; *BladeRoom I*, 2018 WL 1611835, at *6; 1-ER-22 ("The Ninth Circuit has not ruled on whether plaintiffs must apportion damages among trade secrets."). The district court repeatedly rejected Medallia's attempts to require apportionment before and during trial—only to conclude after judgment that apportionment had been required *all along*.

*Before trial, the district court said apportionment is for the jury.* First, the trial court rejected Medallia's apportionment argument at the pretrial *Daubert* and bifurcation motion stages, refusing to exclude EchoSpan's damages expert's testimony because he had not offered an opinion regarding apportionment. 3-ER-385–88; 9-ER-1707 (acknowledging and declining to reconsider its *Daubert* ruling); *see* Statement of the Case § E.1, *supra*.

*Mid-trial, the district court reaffirmed that apportionment is for the jury.* Even when district court indicated for the first time—after EchoSpan rested its case—that it had some concerns about apportionment, the court nonetheless expressly ruled that apportionment was a question for the jury. 8-ER-1575 (describing apportionment of damages as "more of a jury verdict and instruction issue"). At the same time, the district court refused to allow EchoSpan's expert to

51

develop and testify to opinions specifically apportioning damages among trade secrets, even to rebut the apportionment-related opinions of Medallia's expert. 9-ER-1706–08, 1823.

**_After trial, the district court declared that expert apportionment testimony had been required all along._** After the jury rendered its verdict, the district court reversed course and effectively ruled that EchoSpan's case had been dead on arrival because it did not obtain and disclose expert opinions on apportionment ahead of trial. *See* 1-ER-22–29. Although Medallia argued both before and throughout trial that apportionment was required, the district court repeatedly rejected Medallia's theory until after the jury rendered its verdict. EchoSpan, which had taken the court's prior rulings at face value, could not possibly adjust.

The district court acknowledged that it was granting Medallia JMOL based on a "'novel issue of law.'" 1-ER-22 (quoting *Hart v. Massanari*, 266 F.3d 1155, 1169 (9th Cir. 2001)) (noting "[t]he Ninth Circuit has not ruled" on this issue). The district court then advanced a broad new rule: If a plaintiff wins on fewer than all trade secrets, the jury's award is speculative unless supported by explicit apportionment testimony from an expert. The sudden post-verdict requirement that EchoSpan present expert testimony explicitly apportioning damages—and even the district court's mid-trial concerns over apportionment while simultaneously refusing any opportunity to obtain that testimony—distinguish this case from the limited authority requiring apportionment.

In *O2 Micro*, the case on which the district court based its JMOL order, the district court explicitly warned the parties *in advance of trial* that it would require the plaintiff to apportion damages for the jury. *See O2 Micro*, 399 F. Supp. 2d at 1076. The plaintiff was further advised that its expert's testimony "'would be stricken'" for failure to apportion. *Id.*

Here, the issue was repeatedly raised prior to trial. *E.g.*, 3-ER-489–91. But unlike in *O2 Micro*, the district court here did not insist on expert apportionment testimony. There was nothing to suggest that the district court would retroactively apply an expert apportionment requirement—especially when the most recent authorities in the Northern District had rejected one. *See ATS Prods.*, 2012 WL 253315, at *1; *BladeRoom*, 2018 WL 1611835, at *6.

> **C.** **The post-verdict retroactive requirement of expert apportionment testimony caused a miscarriage of justice; denying EchoSpan a new trial on damages was an abuse of discretion.**
>
> > **1.** **The district court abused its discretion by denying the new trial motion based on its conclusion that the underlying judgment as a matter of law against EchoSpan was correct.**

Here, the district court's abrupt turnabout—from repeatedly ruling that apportionment was "more of a jury verdict and instruction issue," 8-ER-1575, to concluding post-verdict that it was an evidentiary issue and that EchoSpan needed to obtain expert opinions specifically assigning dollar values to each trade secret before trial, *see* 1-ER-22–28—justifies a new trial on damages.

At the hearing on Medallia's JMOL motion, both the court and Medallia acknowledged the inequity of the mid-trial change in the legal playing field.

53

The court suggested a new trial might be warranted so the parties "would not have to be adjusting to the mid-trial changes in evidence and rulings. You'd just know you'd better apportion from the beginning." 2-ER-130–31. Medallia agreed: "[T]here's a lot to be said for a new trial for the reasons precisely that you articulated. I mean, this trial—sort of the key aspect of this trial really occurred at the eleventh hour or the eleventh and a half hour." *Id.* at 131.

Yet when EchoSpan sought that new trial on damages based on the court's post-verdict expert apportionment requirement, the district court denied EchoSpan's motion. It did so in less than half a page. 1-ER-6. It did not acknowledge its prior position on the issue. *Id.*

This case is not unlike those where a new trial was appropriate because of mid-trial shifts in legal theory and argument by the opposing party. *See, e.g.*, *Sanford v. Crittenden Mem'l Hosp.*, 141 F.3d 882, 886 (8th Cir. 1998) ("Surprise during trial, by major variance in theory of recovery or defense, undisclosed until after the trial is underway, is a long-established ground for granting a new trial motion."); *Perez-Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 286–88 (1st Cir. 1993); *Twigg*, 894 F.2d at 674–75. The only difference here is that it was the district court that fundamentally changed the rules of the trial after the trial was already over. Unfair surprise is no less a miscarriage of justice because it comes from a post-verdict injection of a new evidentiary requirements by the court rather than a mid-trial change in legal theory by the opposing party.

The district court did not acknowledge EchoSpan's argument that the post-verdict imposition of a new evidentiary burden based on an unsettled issue of law created unfair surprise. *See* 1-ER-6; 2-ER-102–07. Instead, the court recharacterized the issue, denying the motion based on the broad principle that a jury's award of damages requires a reasonable basis. 1-ER-6. But the requirement that damages be reasonably based on the evidence has never been in dispute. If the district court were merely applying settled law to conclude that expert testimony had been required all along, then there is no explanation for it waiting until after the jury's verdict to make that ruling. The court expressly acknowledged the unsettled issue nature of this issue in connection with the JMOL proceedings. *See* 2-ER-130–31. Reversing course and describing the issue as settled does not make it so.

While the determination whether there has been a miscarriage of justice is entrusted to the district court's discretion, *Murphy*, 914 F.2d at 187, the court here did not consider whether the actual circumstances of this case created unfair surprise or a miscarriage of justice. It merely concluded that its post-verdict JMOL order requiring apportionment was legally correct. 1-ER-6 (regarding underlying JMOL ruling: "Certainly, EchoSpan may argue on appeal that the Court reached the wrong conclusion. But that's where these arguments belong, not in a motion for a new trial.").

In denying the new trial motion on this basis, the district court necessarily applied the wrong legal standard. *See Coughlin v. Tailhook Ass'n,* 112 F.3d 1052,

1055 (9th Cir. 1997) ("court abuses its discretion when it bases its decision on an erroneous view of the law"). Rule 50(d) lays out a mechanism specifically allowing for a new trial motion by the party against whom JMOL was granted. The sole question on a post-JMOL motion for new trial thus *cannot be* whether the underlying JMOL was legally sound. If it were, there would be no reason to permit such motions and no reason for Rule 50(d): The JMOL itself would fail with the underlying legal error. *See In re Cervantes*, 219 F.3d 955, 961 (9th Cir. 2000) ("statutes should not be construed in a manner which robs specific provisions of independent effect"; courts "reject interpretations that would render a statutory provision surplusage or a nullity").

The district court's reasoning says nothing about whether the JMOL—even if legally correct—worked a miscarriage of justice under the unique circumstances of this case. This alone requires reversal. *See Johnson*, 251 F.3d at 1230 ("the district court applied the wrong standard and thereby abused its discretion").

### 2. Any implicit finding that the post-verdict change of course on a novel issue of law did not create a miscarriage of justice was likewise an abuse of discretion.

Any *implicit* finding that there has been no miscarriage of justice is "illogical, implausible, or without support in the inferences that may be drawn from the record." *Williams*, 895 F.3d at 1123 (internal quotation marks omitted). The district court's post-verdict ruling requiring expert apportionment testimony was not controlled by precedent. It was surprising because it contradicted the court's prior rulings. And it was unfair because it came far too late in the case for

56

EchoSpan to provide the evidence that the court retroactively demanded but also prohibited EchoSpan from introducing.

The prejudice is manifest:

- The court wiped out the compensatory damages verdict on the ground that EchoSpan failed to offer expert testimony apportioning damages among trade secrets;

- Without compensatory damages, the court said the exemplary damages award could not stand; however,

- Because EchoSpan *could have* received damages if it had foreseen the court's post-verdict decision to retroactively require apportionment, damages were available at law, precluding injunctive relief; and, finally,

- Because there were neither damages nor injunctive relief, EchoSpan was no longer the prevailing party and not entitled to attorney fees.

1-ER-6–8, 27–30.

Given this sequence of events, the situation here is not only more surprising than in *O2 Micro*, *see* § III.B, *supra*; it is also more unfair: In *O2 Micro*, the plaintiff retained millions of dollars in damages even after the court granted judgment. *See O2 Micro*, 399 F. Supp. 2d at 1078, 1080 (awarding $2.7 million in trade secret damages). EchoSpan, by contrast, was left with nothing.

Cases in the patent law context—from which the district court borrowed the apportionment requirement—confirm that a new trial on damages is appropriate where, as here, a court overturns a jury award for failure to provide

evidence apportioning damages. For example, in *Omega Patents, LLC v. CalAmp Corp.*, the Federal Circuit vacated a damages award on the ground that the patentee had failed to apportion damages or prove that the patented invention drove demand for the overall product. 13 F.4th 1361, 1376 (Fed. Cir. 2021). Rather than directing judgment for the defendant, the court remanded for a new trial on damages. *Id.* at 1382; *see also, e.g.*, *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1348–49 (Fed. Cir. 2023) (holding a new trial was required in part because the plaintiff's damages expert improperly accounted for the value of unasserted intellectual property in his damages calculation; reasoning that there was "no sound basis" for "denying [the plaintiff] an opportunity to provide a correct damages case"). Similarly, in *LaserDynamics, Inc. v. Quanta* Computer, 694 F.3d 51, 66–71 (Fed. Cir. 2012) and *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 975–76 (Fed. Cir. 2022), the court affirmed district courts' decisions to grant a new trial where an expert failed to properly apportion damages.

The district court's JMOL ruling came out of the blue and caused a miscarriage of justice. It imposed a brand new evidentiary requirement never before recognized by this Court: One that EchoSpan—given the district court's rejection of the argument both before and during trial—could not have foreseen. At a minimum, a new trial on damages is in order.

## CONCLUSION

The jury found that Medallia misappropriated EchoSpan's administrative tool and awarded EchoSpan 50 percent of the total unjust enrichment damages it sought.  That award was supported by the evidence.  Relying on impermissible adverse inferences and inapposite case law, the district court wiped out the whole verdict—$25.7 million, inclusive of exemplary damages—and left EchoSpan with nothing.  That requires reversal.  But even if it didn't, a new trial would be warranted given the manifest injustice of changing the rules of trial after the jury delivered its verdict.

The amended judgment should be reversed and the jury's damages award reinstated.  At a minimum, the Court should order a new trial on damages.

Dated: February 3, 2025

**GREINES, MARTIN, STEIN & RICHLAND LLP**
  Jeffrey Gurrola
  Alex Chemerinsky

**COUNCILL, GUNNEMANN & CHALLY LLC**
  Jonathan R. Chally
  Jennifer R. Virostko

**LEWIS & LLEWELLYN LLP**
  Evangeline A.Z. Burbidge
  Zachary C. Flood

By:  *s/ Jeffrey Gurrola*

Jeffrey Gurrola

Attorneys for Plaintiff/Appellant ECHOSPAN, INC.

59

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

1.      This brief complies with the type-volume limitation of Cir. R. 32-1(a) because this brief contains **13,752** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Times New Roman font.

Dated: February 3, 2025

**GREINES, MARTIN, STEIN & RICHLAND LLP**
  Jeffrey Gurrola
  Alex Chemerinsky

**COUNCILL, GUNNEMANN & CHALLY LLC**
  Jonathan R. Chally
  Jennifer R. Virostko

**LEWIS & LLEWELLYN LLP**
  Evangeline A.Z. Burbidge
  Zachary C. Flood

By:   *s/ Jeffrey Gurrola*

Jeffrey Gurrola

Attorneys for Plaintiff/Appellant
ECHOSPAN, INC.

## STATEMENT OF RELATED CASES

Appellant EchoSpan, Inc. represents that it is not aware of any related cases pending in this Court.

Dated: February 3, 2025

**GREINES, MARTIN, STEIN & RICHLAND LLP**
Jeffrey Gurrola
Alex Chemerinsky

**COUNCILL, GUNNEMANN & CHALLY LLC**
Jennifer R. Virostko

**LEWIS & LLEWELLYN LLP**
Evangeline A.Z. Burbidge
Zachary C. Flood

By: *s/ Jeffrey Gurrola*
Jeffrey Gurrola

Attorneys for Plaintiff/Appellant
ECHOSPAN, INC.

61

## CERTIFICATE OF SERVICE
[24-4751]

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 6420 Wilshire Boulevard, Suite 1100, Los Angeles, California 90048, and my email address is mallen@gmsr.com.

I certify that on February 3, 2025, I electronically filed the foregoing **APPELLANT'S OPENING BRIEF [REDACTED]** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.

I certify that each party in the case is represented by counsel who are registered ACMS users and will be served by the appellate ACMS system.

*s/ Maureen Allen*
Maureen Allen